IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–00538–EWN–CBS


SHAVO NORGREN (INDIA) PRIVATE LIMITED,

     Plaintiff,

v.

C.A. NORGREN CO., U.S.A.,

     Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

     This is a breach of contract and misrepresentation case.  Plaintiff Shavo Norgren (India) Private Limited asserts claims for breach of contract, intentional misrepresentation, and negligent misrepresentation against Defendant C.A. Norgren Co., U.S.A.  This matter is before the court on cross-motions for summary judgment: (1) "Defendant's Motion for Summary Judgment," filed November 23, 2005; and (2) "Plaintiff's Motion for Summary Judgment," filed November 23, 2005.  Jurisdiction is based on 28 U.S.C. § 1332 (2006), diversity of citizenship.

# FACTS

## 1.    *Factual Background*

### a.    *The Parties*

Defendant is a company based in Littleton, Colorado that designs, manufactures, and sells pneumatic components for industrial machinery.  (Def.'s Opening Br. in Supp. of Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 1 [filed Nov. 23, 2005] [hereinafter "Def.'s Br."]; *admitted at* Pl. Shavo Norgren (India) Private Limited's Resp. in Opp'n to Def. C.A. Norgren Co., U.S.A.'s, [sic] Mot. for Summ. J., Resp. to Statement of Undisputed Material Facts ¶ 1 [filed Dec. 13, 2005] [hereinafter "Pl.'s Resp."].)  Plaintiff is a company based in India.  (*Id.*, Ex. A–2 at 1 [Agreement for Financial Investment].)  Plaintiff was established in 1965 as a joint venture between Plaintiff and Defendant to manufacture pneumatic components for industrial machinery designed by Defendant.  (Pl. Shavo (Norgren) [sic] India [sic] Private Limited's Br. in Supp. of Mot. for Summ. J., Statement of Undisputed Facts ¶ 1 [filed Nov. 23, 2005] [hereinafter "Pl.'s Br."]; *admitted at* Def.'s Br. in Resp. to Pl.'s Mot. for Summ. J., Resp. to Statement of Undisputed Material Facts ¶ 1 [filed Dec. 16, 2005] [hereinafter "Def.'s Resp."].)

### b.    *The Joint Venture*

#### (1)    *The 1965 Agreements*

In 1965, Plaintiff and Defendant executed three related contracts: (1) Agreement for Financial Investment; (2) Agreement for Supply of Know-How; and (3) Agreement for Technical Services.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 2; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 2.)  Pursuant to the Agreement for Financial

2

Investment, Defendant supplied Plaintiff with machinery and tooling in exchange for a twenty-four

percent equity interest in Plaintiff.  (*Id.*, Statement of Undisputed Material Facts ¶ 3; *admitted at*

Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 3.)  The Agreement for Supply of

Know-How provided that Defendant would supply Plaintiff with "secret techniques, know-how,

designs, [and] testing methods" related to Defendant's products in exchange for certain cash

payments.  (*Id.*, Statement of Undisputed Material Facts ¶ 4; *admitted at* Pl.'s Resp., Resp. to

Statement of Undisputed Material Facts ¶ 4.)  The Agreement for Technical Services (the "ATS")

provided that:

> It is the intention of the parties hereto that this Agreement will not only cover
> present but future [Defendant-designed] devices, and [Defendant] therefore shall
> disclose and make available to [Plaintiff] information on future developments, and
> improvements of its line of manufacture, and detail working drawings on such
> [Defendant-designed] devices as [Defendant] desires to release for manufacture
> and sale.  [Plaintiff] shall not manufacture, or cause to be manufactured, and/or sell
> any [Defendant-designed] devices not released by [Defendant] for manufacture.

(*Id.*, Statement of Undisputed Material Facts ¶ 5; *admitted at* Pl.'s Resp., Resp. to Statement of

Undisputed Material Facts ¶ 5.)  The ATS expired on July 31, 1978.  (*Id.*, Statement of

Undisputed Material Facts ¶ 6; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed

Material Facts ¶ 6.)

### *(2)    The 1979 Memorandum of Intent*

On November 8, 1979, Plaintiff and Defendant negotiated and executed a Memorandum

of Intent ("MOI").  (Pl.'s Br., Statement of Undisputed Facts ¶ 4; *admitted at* Def.'s Resp., Resp.

to Statement of Undisputed Material Facts ¶ 4.)  In the MOI's first clause, Defendant granted

Plaintiff the permanent right to manufacture: (1) those Defendant-designed filter-regulator-

3

lubricator products ("FRL products") and related products that Plaintiff manufactured as of June 30, 1979; and (2) nineteen additional Defendant-designed FRL products listed in Exhibit A to the MOI.  (Def.'s Br., Ex. A–6 at ¶ 1 [MOI].)  In the MOI's second clause, Defendant agreed to furnish Plaintiff with "drawings and technical support as done in the past for the products identified in [the MOI] and changes and improvements thereto as required from time to time so long as [Defendant] maintains an equity interest in [Plaintiff] and at least until September 30, 1986."  (*Id.*, Ex. A–6 at ¶ 2 [MOI].)  In the third clause, Plaintiff agreed to pay Defendant $70,000 as consideration for the agreement.  (*Id.*, Ex. A–6 at ¶ 3 [MOI].)  In the sixth clause, Plaintiff agreed "to apply to the Indian Government for obtaining official permission, if required, to enter into a new Agreement, on above stated general terms, and obtain Indian Government approval."  (*Id.*, Ex. A–6 at ¶ 6 [MOI].)  In the eighth clause, the parties agreed that the MOI "supercedes all previous memoranda and agreements between [Defendant] and [Plaintiff]."  (*Id.*, Ex. A–6 at ¶ 8 [MOI].)

Plaintiff asserts that the MOI is currently the only agreement governing the relationship between Plaintiff and Defendant.  (Pl.'s Br., Statement of Undisputed Facts ¶ 10; *deemed admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 10.)[1]  Neither

---

[1]I emphasize that my practice standards state:
Any denial [in a brief in opposition to summary judgment] shall be accompanied by a brief factual explanation of the reason(s) for the denial and a *specific reference* to material in the record supporting the denial.
* * *
The sole purpose of these procedures is to establish facts and determine which of them are in dispute.  *Legal* argument is not permitted here and should be reserved for separate portions of the briefs.

Plaintiff nor Defendant is aware of any direct communication whereby Defendant informed

Plaintiff that it would no longer perform its duties under the MOI.  (*Id.*, Ex. A ¶ 6 [11/23/05 Decl.

of H. Vora], Ex. 4 at 26–28 [Dep. of D. McMahan].)[2]

      Correspondence from Defendant to Plaintiff, as recent as 2004, indicates that Defendant

recognized the ongoing nature of the parties' contractual relationship.  (*Id.*, Ex. 3 ¶ 4 [1/29/04

Letter from P. Wallace to H. Vora], Ex. 6 ¶¶ 5–6 [6/14/03 Letter from Sen-Oberoi to Plaintiff],

Ex. 8 ¶ 4 [9/14/04 Letter from D. Brant to H. Vora].)  Additionally, Defendant currently

maintains a twenty-four percent equity interest in Plaintiff.  (*Id.*, Statement of Undisputed Facts ¶

12; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 12.)

---

(Practice Standards — Civil, Special Instructions Concerning Motions for Summary Judgment ¶¶ 4, 7 [emphases in original].)  Here, Defendant has offended both rules.  (*See* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 10 [no specific reference, legal argument], 13 [no specific reference], 17 [no specific reference], 31–33 [no specific reference, legal argument], 34–35 [no specific reference].)  Accordingly, I deem admitted each of Plaintiff's antecedently corresponding statements of undisputed material fact, set forth in Plaintiff's brief in support of its motion for summary judgment.  (Pl.'s Br., Statement of Undisputed Facts ¶¶ 10, 13, 17, 31–35.)

    [2]Plaintiff's affidavits and exhibits were filed in a manner contrary to the customary practice in this district.  In connection with each of its three summary judgment briefs, Plaintiff filed as separately docketed documents: (1) sworn affidavits of Plaintiff's managing director, Harshad Vora; and (2) declarations of Plaintiff's attorney, Shreya Ramchandani.  All of Plaintiff's exhibits are attached to the declarations of Ms. Ramchandani.  To avoid confusion, I will treat both the attached exhibits and Mr. Vora's affidavits as if they were attached to the summary judgment briefs with which they were filed.  Because Mr. Vora's affidavits are not numbered as exhibits, I will refer to each one of his three declarations as "Exhibit A" to the brief with which it was filed.

### c.      The Drawings

Plaintiff claims it regularly "informed its customers and advertises [sic] that the MOI products" Plaintiff manufactured were based on Defendant's updated designs and drawings.  (*Id.*, Ex. A ¶ 10 [11/23/05 Decl. of H. Vora].)  Subsequent to execution of the MOI, Defendant provided Plaintiff with technical support and drawings related to some changes to MOI products.  (Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 15; *admitted in relevant part at* Pl. Shavo Norgren (India) Private Limited's Reply Br. in Supp. of its Mot. for Summ. J., Reply Concerning Undisputed Facts ¶ 15 [filed Jan. 12, 2006] [hereinafter "Pl.'s Reply"].)

### d.      The 1991 Letter

Plaintiff sent Defendant a letter dated March 4, 1991, in which Plaintiff offered to pay Defendant $50,000 for the delivery of manufacturing drawings of two FRL product lines.  (Def.'s Br., Ex. A–9 at 1 [1991 Letter].)  Both requested FRL product lines are listed in the MOI.  (*Id.*, Statement of Undisputed Material Facts ¶ 19; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 19.)  The 1991 letter further indicates that Plaintiff was attempting to meet an imminent March 31, 1991 tax deadline.  (*Id.*, Ex. A–9 at 1 [1991 Letter].)  In the 1991 letter, Plaintiff requested that Defendant "await the green signal" from Plaintiff to execute the sale.  (*Id.*, Ex. A–9 at 2 [1991 Letter].)

### e.      Defendant's April 2003 Advertisement

In April 2003, Defendant's sister company, IMI-Herion-Norgren, placed an advertisement in an industry magazine.  (Def.'s Resp., Statement of Additional Material Facts ¶ 9; *admitted at* Pl.'s Reply, Resp. to Statement of Additional Material Facts ¶ 9.)  The advertisement stated: (1)

6

the technical know-how and related agreements between Plaintiff and Defendant had expired; and (2) Plaintiff would no longer distribute Defendant's products.  (Pl.'s Br., Statement of Undisputed Facts ¶¶ 22–23; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 22–23.)  Plaintiff's management claims it was surprised by the statements in the advertisement. (Def.'s Resp., Ex. A–12 at 60 [Dep. of H. Vora].)

> ### f.      *Plaintiff's Subsequent Requests for Updates*

From August 2003 to December 2003, Plaintiff sent Defendant several letters requesting the latest MOI product updates.  (Pl.'s Br., Statement of Undisputed Facts ¶ 24; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 24.)  In a reply dated January 29, 2004, Defendant's president and CEO stated that he believed Plaintiff already possessed the latest information regarding the MOI products.  (*Id.*, Statement of Undisputed Facts ¶¶ 25–26; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 25–26.)  In a letter dated April 12, 2004, Plaintiff reiterated that it did not have the latest MOI product updates and again requested such updates.  (*Id.*, Ex. 11 ¶ 1 [4/12/04 Letter from H. Vora to P. Wallace].)  Defendant did not respond to Plaintiff's subsequent  letters requesting MOI product updates. (*Id.*, Statement of Undisputed Facts ¶¶ 28–30; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 28–30.)

> ### g.      *Defendant's Modifications of the MOI Products*

Since the execution of the MOI in 1979, Defendant has recorded more than 4,000 changes to the products listed in the MOI.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 15; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 15.)  Defendant

asserts that virtually all of these 4,000 changes to the MOI products were minor in nature.[3]  (*Id.*,

Statement of Undisputed Material Facts ¶ 16; *denied at* Pl.'s Resp., Resp. to Statement of

Undisputed Material Facts ¶ 16.)  Defendant further asserts that virtually all of these recorded

changes arose from such localized events as, for example, changing to a new component supplier

at its Colorado manufacturing site.  (*Id.*, Statement of Undisputed Material Facts ¶16; *denied at*

Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 16.)  Plaintiff asserts that its

comparison of the "L17 series" MOI product recently manufactured by Plaintiff with the same

product recently manufactured by Defendant revealed "significant" differences between the two

products.  (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 16; *denied at* Def.'s

Reply, Reply Concerning Undisputed Facts ¶ 16.)

**2.**    ***Procedural History***

On March 23, 2005, Plaintiff filed its complaint in this court.  (Compl. [filed Mar. 23,

2005].)  The complaint asserts claims for breach of contract, intentional misrepresentation, and

negligent misrepresentation.  (*Id.* ¶¶ 26–46.)  Defendant filed its answer on June 29, 2005.

(Answer [filed June 29, 2005].)

---

[3]Plaintiff complains that, despite its discovery requests, Defendant never provided any evidence regarding the number or type of changes made to MOI products since execution of the MOI.  (Pl.'s Resp. at 19–20.)  I refer Plaintiff to Federal Rule of Civil Procedure thirty-seven, which sets forth procedures concerning motions for orders compelling discovery.  *See* Fed. R. Civ. P. 37 (2006).  Plaintiff further complains that Defendant failed to come forward with any evidence beyond the "conclusory" testimony of its Rule 30(b)(6) witness that changes to MOI products were minor.  (Pl.'s Resp. at 19–20.)  As it appears that Defendant's Rule 30(b)(6) witness's testimony regarding the number and type of changes to the MOI is testimony related to a matter "known or reasonably available to" Defendant, I find Defendant's evidence on this point is not conclusory.  *See* Fed. R. Civ. P. 30(b)(6) (2006).

On November 23, 2005, Defendant filed a motion for summary judgment.  (Def.'s Br.)
Defendant argues: (1) it has no obligation under the MOI to provide Plaintiff with updated
drawings and designs, (*id.* at 5–7); (2) no reasonable juror could resolve any extant ambiguities in
the MOI against Defendant, (*id.* at 7–10); and (3) Plaintiff failed to perform substantially its
obligations under the MOI.[4]  (*Id.* at 10–11.)  On December 13, 2006, Plaintiff filed a response in
opposition to Defendant's motion.  (Pl.'s Resp.)  On January 9, 2006, Defendant filed a reply in
support of its motion for summary judgment.  (Def.'s Reply.)

On November 23, 2005, Plaintiff filed a motion for summary judgment.  (Pl.'s Br.)
Plaintiff argues that trial is not necessary because: (1) Defendant has not put forward any evidence
that could defeat Plaintiff's breach of contract claim, (*id.* at 9–18); and (2) Plaintiff has put forth
substantial evidence in support of its misrepresentation claims.  (*Id.* at 18–26.)  On December 16,
2005, Defendant filed its response in opposition to Plaintiff's motion for summary judgment.
(Def.'s Resp.)  On January 12, 2006, Plaintiff filed its reply in support of its motion for summary
judgment.  (Pl.'s Reply.)

## ANALYSIS

### 1.    *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant
summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions

---

[4]Defendant fails to mention Plaintiff's misrepresentation claims in its brief in support of its
motion for summary judgment.  (Def.'s Br., *passim*.)  As such, I treat Defendant's motion as one
for partial summary judgment.

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)

(2006); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc.*

*v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the

initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the

burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material

matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving

party may not rest solely on the allegations in the pleadings, but must instead designate "specific

facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P.

56(e) (2006). A fact in dispute is "material" if it might affect the outcome of the suit under the

governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury

to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when

ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d

1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed

in the light most favorable to the party opposing summary judgment. *Byers v. City of*

*Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

Where parties file cross-motions for summary judgment, the court is "entitled to assume that no

evidence needs to be considered other than that filed by the parties, but summary judgment is

nevertheless inappropriate if disputes remain as to material facts." *James Barlow*

*Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citing *Harrison W. Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 [10th Cir. 1981]).

**2.      *Evaluation of Claims***

As stated above, Plaintiff asserts the following claims for relief against Defendant: (1) breach of contract, (2) intentional misrepresentation, and (3) negligent misrepresentation. (Compl. ¶¶ 26–46.)  I analyze Plaintiff's breach of contract claim separately and its tort claims jointly.  The parties do not dispute that Colorado law governs the substance of Plaintiff's claims in this diversity action.

**a.      *Breach of Contract***

Both parties assert that they are entitled to summary judgment on Plaintiff's breach of contract claim.  Plaintiff argues: (1) the evidence overwhelmingly proves that the MOI is a currently binding contract, (Pl.'s Br. at 9–14); (2) Plaintiff has substantially performed its MOI obligations, (*id.* at 14–15); (3) Defendant has failed to satisfy its MOI obligation to provide updates "whenever changes [are] made to MOI products," (*id.* at 15–17); and (4) Plaintiff has suffered damages as a result of Defendant's breach.  (*Id.* at 17–19.)  Defendant argues: (1) the MOI unambiguously obligates Defendant to provide Plaintiff with product updates only when Defendant desires to make such updates available to Plaintiff, (Def.'s Br. at 6–7); (2) even if the MOI is ambiguous, the extrinsic evidence is such that no reasonable juror could resolve the ambiguity against Defendant, (*id.* at 7–10); and (3) Plaintiff failed to perform its MOI obligation to obtain the Indian government's approval of the MOI.  (*Id.* at 10–11; Def.'s Reply at 6–9.)

Under Colorado law, the elements of a breach of contract claim are: (1) existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; (4) resulting in damages to the plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). I address the parties' arguments in accordance to their correlation with the elements of breach of contract.

### *(1)   Existence of a Contract*

The parties do not dispute that they entered into a binding contract, the MOI, on November 8, 1979. (Pl.'s Br., Statement of Undisputed Facts ¶ 4; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 4.) Plaintiff extensively argues that the MOI presently binds the parties. (*Id.* at 9–14.) Defendant's briefs do not materially respond to Plaintiff's contention. (*See* Def.'s Br. at 5–11; Def's Reply at 4–9; Def.'s Resp. 9–16.) Instead, Defendant sidesteps Plaintiff's argument by contending that the MOI is not presently binding because Plaintiff breached the agreement. (*See, e.g.*, Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 10, 14.) Defendant's misdirected argument is relevant not to the first element of breach of contract, but to the second. *See W. Distrib. Co.*, 841 P.2d at 1058. Nevertheless, I embark on a brief review of the facts in order to demonstrate the MOI to be a currently binding contract.

The second clause of the MOI provides that the contract will continue "so long as [Defendant] maintains an equity interest in [Plaintiff] and at least until September 30, 1986." (Def.'s Br., Ex. A–6 ¶ 2 [MOI].) It is undisputed that Defendant currently maintains an equity interest in Plaintiff. (Pl.'s Br., Statement of Undisputed Facts ¶ 12; *admitted at* Def.'s Resp.,

12

Resp. to Statement of Undisputed Material Facts ¶ 12.)  Additionally, the testimony of

Defendant's Rule 30(b)(6) witness indicates that Defendant considers itself bound by the MOI:

> Q.   And at any point after September 30, 1986, did [Defendant] ever notify [Plaintiff] that it was terminating [the MOI]?
> A.   Not that I'm aware of.
> Q.   Did [Defendant] continue to abide by this agreement post-September 30, 1986?
> A.   Near as I can tell, yes.

(*Id.*, Ex. 4 at 26–27 [Dep. of D. McMahan].)  As such, no genuine issue of material fact exists as

to whether Plaintiff has established the existence of a binding contract in the form of the MOI.

### (2)   *Plaintiff's Performance*

Defendant argues that Plaintiff failed to perform its obligations under clause six of the

MOI.  (Def.'s Resp. at 9–11.)  Clause six requires Plaintiff to apply for and obtain official

approval from the government of India to enter into "a new Agreement, on above stated general

terms,"[5] only if such approval is necessary.  (Def.'s Br., Ex. A–6 at ¶ 6 [MOI].)  Plaintiff admits

that it has not obtained such approval, but asserts that it "was advised" that the Indian

government did not require such approval.  (Pl.'s Resp., Ex. 3 at 87 [Dep. of H. Vora].)  While

Defendant argues that approval was indeed required,[6] Defendant's Rule 30(b)(6) witness indicates

---

[5]The parties do not claim that they ever entered into a "new Agreement" based on the "stated general terms" of the MOI.  Nor do the parties address the question whether their failure to enter into such an agreement renders Plaintiff's obligations under MOI clause six irrelevant to the present dispute.

[6]Plaintiff and Defendant dispute whether Indian law circa 1979 required the approval contemplated by the MOI.  (Def.'s Reply at 7–8; Def.'s Resp. at 9–11; Pl.'s Reply at 17–19.)  My ensuing determination that Defendant waived its rights under MOI clause six renders moot any consideration whether such approval was required.

that prior to this litigation Defendant was long aware of and unconcerned by Plaintiff's failure to

obtain such approval:

> Q.    And did the obtaining of approval [from the Indian government under MOI
>        clause six] affect the validity of the agreement in any way?
> A.    According to the [MOI's] language, if [Plaintiff] had to have the approval,
>        then it would affect the validity, yes, if they didn't obtain it.
> Q.    Despite that, post September 30, 1986, [Defendant] never notified
>        [Plaintiff] of any issues with respect to the validity of the MOI?
> A.    Not that I've seen, no.

(Pl.'s Br., Ex. 4 at 27–28 [Dep. of D. McMahan].)

> Plaintiff argues:
>
> [a]fter years of performance of its obligations under the MOI, receiving substantial
> benefit from the contract, recognizing and attempting to enforce the MOI against
> [Plaintiff] recently, and all that has occurred in the approximately [twenty-six]
> years since the MOI was agreed to and executed, [Defendant] cannot now attempt
> to avoid its obligations under the MOI.

(Pl.'s Reply at 16.)  In support of its argument, Plaintiff cites to an unreported case, *Cross*

*Country Land Servs., Inc. v. PB Network Servs., Inc.*, No. CIV01CV00568, 2005 WL 3591868

(D. Colo. Dec. 30, 2005).  (*Id.* at 16–17.)  In pertinent part, *Cross Country* confusingly applies

principles of ratification to a contract the court had already determined was not entered into in a

context of fraud or deceit.[7]  2005 WL 3591868 at *11–12.  Plaintiff couches aspects of its

argument in terms of "ratification."  (Pl.'s Reply at 16–17.)  Viewing Plaintiff's argument and

*Cross Country* together, Plaintiff essentially argues that Defendant waived its rights under MOI

paragraph six.  (*Id.*)  I treat Plaintiff's argument as one of implied waiver.

---

[7]The doctrine of ratification generally applies in instances where a contract is voidable due
to circumstances such as incapacity, fraud, or duress.  *See Jones v. Dressel*, 623 P.2d 370,
373–74 (Colo. 1981); Restatement (Second) of Contracts § 381 (1981).

"A waiver may be shown by a course of conduct signifying a purpose not to stand on a right, leading, by a reasonable inference, to the conclusion that the right in question will not be insisted upon." *Church Mut. Ins. Co. v. Klein*, 940 P.2d 1001, 1003 (Colo. Ct. App. 1996) (citing *Sung v. McCullough*, 651 P.2d 447 [Colo. Ct. App. 1982]); *see also Union Pac. Ry. Co. v. Riss Int'l Corp.*, 687 P.2d 993, 995 (Colo. Ct. App. 1984) ("[A]n obligor's acceptance . . . of the obligee's performance, with knowledge of or reason to know of the non-occurrence of a condition of the obligor's duty, operates as a promise to perform in spite of that non-occurrence.").

Even assuming that Plaintiff was required to obtain approval from the government of India, Defendant's knowing failure to stand on its rights for more than a quarter of a century gives rise to the implication of waiver. Prior to this litigation, Defendant was aware of the possibility that government approval was required, but had no confirmation that such approval had been obtained. (Pl.'s Br., Ex. 4 at 27–28 [Dep. of D. McMahan].) Nevertheless, it appears that Defendant never contacted Plaintiff with any concerns regarding Plaintiff's compliance with MOI clause six. (*Id.*, Ex. 4 at 28 [Dep. of D. McMahan].) If government approval were indeed a material aspect of the agreement, one would expect Defendant, a sophisticated company, to endeavor to obtain some affirmation of approval from Plaintiff or the Indian government. *See In re Marriage of Robbins*, 8 P.3d 625, 628, 630 (Colo. Ct. App. 2000) (finding governmental agency waived its statutory right to interest payments where, for approximately four years, agency had not required defendant pay interest on arrearages, had not advised defendant that it intended to collect interest, and had not included interest in its calculation of arrearages due). Instead, the

15

evidence indicates that Defendant, like the agency in *Robbins*, sat for years on its rights under the MOI.

Moreover, Defendant's inaction in relation to MOI clause six stands in stark contrast to Defendant's conduct with regard to the anti-competitive provisions of the MOI.  Defendant recently hired Indian lawyers in an effort to force Plaintiff to cease commercial activities in territories not contemplated by the MOI.  (Pl.'s Br., Ex. 6 ¶¶ 5–6 [6/14/03 Letter from Sen-Oberoi to Plaintiff].)  If clause six were a similarly material aspect of the parties' agreement, one would expect to see some evidence that Defendant had sought to confirm Plaintiff's compliance with the clause and, if necessary, had acted to enforce compliance therewith.  Such evidence is sorely lacking from the record before this court.

Additionally, Defendant long performed its MOI obligations in the absence of Plaintiff's submission of the MOI for government approval.  (*Id.*, Statement of Undisputed Facts ¶ 15; *admitted in relevant part at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 15.) Had Plaintiff's failure to secure government approval been material to the contract, one would expect some evidence of a colloquy between Defendant and Plaintiff on the matter.  Further, statements by Defendant's own employees indicate that Defendant materially benefitted from the MOI because the agreement prevented Plaintiff from becoming a "formidable competitor" in the international market.  (*Id.*, Ex. 19 at 2 [11/8/79 Letter from D. Streeter to D. Justham].)  When entertaining cross motions for summary judgment, a court is "entitled to assume that no evidence needs to be considered other than that filed by the parties." *James Barlow Family Ltd. P'ship*, 132 F.3d at 1319.  In light of both (1) the paucity of evidence indicating Defendant asserted its

16

rights under MOI clause six at any time prior to this litigation and (2) the strong evidence

indicating Defendant did not view clause six as a material aspect of the agreement, I find that no

genuine issue of fact exists regarding Defendant's lack of intent to stand on its MOI clause six

rights. *See Klein*, 940 P.2d at 1003.  Thus, Defendant has waived those rights and cannot raise

them in this litigation.

### (3)    *Defendant's Obligations under the MOI*

#### (a)    *MOI Clause One*

Plaintiff argues that MOI clause one "obligates [Defendant] to not [sic] interfere with

[Plaintiff's] 'permanent right to manufacture' . . . MOI products." (Pl.'s Br. at 15.)  Plaintiff

asserts that Defendant breached this provision by publishing the April 2003 advertisement.  (*Id.*)

Plaintiff further claims the advertisement "is in direct contradiction of [MOI clause one] because it

interferes with [Plaintiff's] contractual right pursuant to the MOI to permanently manufacture the

MOI products."  (*Id.*)  None of the parties' subsequent briefs respond to or elaborate on this

argument.  (*See* Def.'s Br., *passim*; Def.'s Reply, *passim*; Def.'s Resp., *passim*; Pl.'s Reply,

*passim*; Pl.'s Resp., *passim*.)

The April 2003 advertisement is misleading.[8]  Nevertheless, the MOI merely grants

Plaintiff the "permanent right to manufacture" MOI products, and makes no mention of the

consequences of "interference" with the rights established therein.  (Def.'s Br., Ex. A–6 ¶¶ 1–9

---

[8]The advertisement states: (1) the technical know-how and related agreements between
Plaintiff and Defendant had expired; and (2) Plaintiff would no longer distribute Defendant's
products.  (Pl.'s Br., Statement of Undisputed Facts ¶¶ 22–23; *admitted at* Def.'s Resp., Resp. to
Statement of Undisputed Material Facts ¶¶ 22–23.)  Thus, the ad is contrary to Defendant's own
recognition of the ongoing validity of the MOI.  *See supra Analysis* § 2(a)(1).

[MOI].)  Perhaps Plaintiff is attempting to argue either breach of implied covenant of good faith and fair dealing or tortious interference with contract.  I decline to engage Plaintiff's haphazard argument because Plaintiff failed to allege either of the two claims in its complaint.  (*See* Compl., *passim*.)  Thus, Plaintiff's claim that Defendant is in breach of MOI clause one fails as a matter of law.

>           (b)      *MOI Clause Two*

>           (i)      *The MOI Is Ambiguous*

The parties dispute whether MOI clause two: (1) requires Defendant to provide Plaintiff with all MOI product updates, (Pl.'s Reply at 20); or (2) affords Defendant total discretion as to which updates it may provide.  (Def.'s Br. at 6.)  In relevant part, MOI clause two provides: "[Defendant] agrees to provide to [Plaintiff] drawings and technical support as done in the past for the [MOI products] and changes and improvements thereto as required from time to time so long as [Defendant] maintains an equity interest in [Plaintiff] . . . ."  (Def.'s Br., Ex. A–6 at ¶ 2 [MOI].)

Defendant argues that the phrase "as done in the past" in MOI clause two refers to the parties' prior arrangement under the expired ATS.  (*Id.* at 5–7.)  Defendant claims that the ATS and the MOI together unambiguously obligate it to provide Plaintiff with MOI product updates only to the extent that Defendant desires to make such updates available to Plaintiff.  (*Id.* at 6.)  Plaintiff contends the "plain language" of the MOI entitles it to "each and everyone [sic] one [sic] of the more than 4,000 updated [MOI] drawings" that Defendant has created since the execution

of the MOI in 1979.  (Pl.'s Reply at 22.)  Plaintiff purports to offer course of dealing evidence in

support of this position.  (*Id.* at 21–22.)

Interpretation of a written contract and the determination of whether a provision in the

contract is ambiguous are questions of law.  *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d

371, 374 (Colo. 1990).  The primary goal of contract interpretation is to determine and effectuate

the intention of the parties.  *May v. U.S.*, 756 P.2d 362, 369 (Colo. 1988).  "The parties' intent is

determined primarily from the language of the instrument itself and extraneous evidence of intent

is only admissible where there is an ambiguity in the terms of the agreement."  *Id.*  To determine

whether a contractual provision is ambiguous, "the instrument's language must be examined and

construed in harmony with the plain and generally accepted meaning of the words employed, and

reference must be made to all of the provisions of the agreement."  *Id.* (citations and quotations

omitted).  A provision is ambiguous "if it is fairly susceptible to more than one interpretation."

*Fibreglas*, 799 P.2d at 374 (citation omitted).

The sparse language of MOI clause two is fairly susceptible to more than one

interpretation as to the level of discretion Defendant retains with respect to apprising Plaintiff of

MOI product updates.[9]  First, the effect that the phrase "as done in the past" has on Defendant's

obligation to provide "drawings and technical support" is ambiguous.  "[A]s done in the past"

could plausibly refer to: (1) Defendant's provision of drawings as specifically governed by the

---

[9]The entire MOI consists of one skeletal page comprised of nine brief paragraphs, followed by a one-page exhibit listing the specific products covered by the agreement.  (Def.'s Br., Ex. A–6, *passim.* [MOI].)

parties' prior contract;[10] (2) general practices the parties developed over the entire course of their

pre-MOI relationship;[11] (3) Defendant's provision of drawings after the expiration of the parties'

prior contract, but before implementation of the MOI; or (4) any combination or permutation of

the above.  Second, nothing in the contract indicates how the words "as required from time to

time" modify Defendant's obligation to provide "changes and improvements" to MOI products.

The phrase "as required" conspicuously lacks a subject (*i.e.*, it suggests the question: "'As

required' *by what*?").  Consequently, Defendant's obligation to provide "changes and

improvements" could plausibly be governed by: (1) prior agreement; (2) past practice; (3)

necessity; (4) Defendant's judgment; or (5) some combination or permutation of the above.

Finally, nothing in the other paragraphs of the MOI speaks to how the singularly oblique phrasing

of MOI clause one bears upon Defendant's obligation to provide MOI updates.  (Def.'s Br., Ex.

---

[10]Defendant argues the MOI incorporates the ATS such that examination of the ATS would not violate the general proscription against considering extrinsic evidence in the determination whether the language of a contract is ambiguous in and of itself.  (Def.'s Resp. at 12.)  However, the facts reveal that: (1) the MOI explicitly disclaims incorporation of any past agreement, (Def.'s Br., Ex. A–6 at ¶ 6 [MOI]); and (2) the ATS expired prior to execution of the MOI.  (*Id.*, Statement of Undisputed Material Facts ¶ 6.)  *Cf. BA Mortgage Co. v. Unisal Dev., Inc.*, 469 F. Supp. 1258, 1265 (D. Colo. 1979) (harmonizing two contemporary agreements, the first of which made provision for effective incorporation by reference of the second).  I reject Defendant's argument.

[11]Plaintiff proffers the deposition testimony of its managing director to prove that the MOI is *not* ambiguous.  (Pl.'s Reply at 21.)  Without citation to authority, Plaintiff asserts that such testimony "is not extrinsic evidence used to interpret the MOI, but rather a description of the parties' course of dealing" prior to the MOI.  (*Id.* at 22.)  Any evidence bearing on the meaning of an agreement that is not contained within the contract's four corners is extrinsic evidence.  *See Fibreglas*, 799 P.2d at 374 ("If a contract is not ambiguous, extrinsic evidence is not admissible to prove the parties' intent, and the parties' intent must be determined from the terms of the contract."); *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984) (same).  I reject Plaintiff's proffer.

A–6 at ¶ 1–9 [MOI].)  Thus, insofar as MOI clause two intimates myriad and conflicting answers to the question of Defendant's discretion, the agreement is "susceptible to more than one interpretation."  *See Fibreglas*, 799 P.2d at 374.  The MOI is ambiguous.

### *(ii)   Extrinsic Evidence*

"When an ambiguity is found to exist and cannot be resolved by reference to other contractual provisions, extrinsic evidence must be considered by the trial court in order to determine the mutual intent of the parties at the time of contracting."  *Pepcol Mfg. Co.*, 687 P.2d at 1314.  The meaning of the terms of an ambiguous contract "is generally an issue of fact to be determined in the same manner as other disputed factual issues."  *Union Rural Elec. Ass'n v. Pub. Utils. Comm'n*, 661 P.2d 247, 251 (Colo. 1983).  Extrinsic evidence may include any pertinent circumstances attendant upon the transaction, including the conduct of the parties under the agreement.  *Id.* (citing *Nahring v. Denver*, 484 P.2d 1235, 1237 [Colo. 1971]); *accord E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005) (stating that a court may consider parole evidence to explain or clarify the meaning of an ambiguous document).

Each party argues that the extrinsic evidence resolves the MOI's ambiguity in favor of its respective interpretation of the agreement.  Defendant argues that Plaintiff's pre-litigation conduct confirms Plaintiff was not entitled to every MOI product update Defendant produced.  (Def.'s Br. at 7–10.)  Plaintiff argues that Defendant's pre-litigation conduct confirms Defendant did not retain discretion to provide Plaintiff with only those updates that it desired to release to Plaintiff.  (Pl.'s Reply at 24–30.)

I do not purport to address all of the extrinsic evidence (or arguments relating thereto) that the parties raise—particularly because the parties focus chiefly on aspects of their conduct both prior to and under the agreement that do not bear on the meaning of MOI clause two.  A review of key admissions by both parties as well as certain other pieces of extrinsic evidence is: (1) on one hand, sufficient to dispose of the overly positional stances that the parties have assumed in their briefs, but (2) on the other hand, insufficient to resolve definitively the fundamental question of the parties' mutual intent under the MOI.

I first consider the deposition testimony of Plaintiff's managing director, Harshad Vora, concerning the parties' pre-litigation conduct.  The construction parties place on a contract prior to a dispute is one of the best indicators of their true intent.  *Blecker v. Kofoed*, 672 P.2d 526, 528 (Colo. 1983).  Mr. Vora's testimony lays bare the implausibility of Plaintiff's contention that the "plain language" of the MOI requires Defendant to send Plaintiff "each and everyone [sic] one [sic] of the more than 4,000 updated drawings since 1979 . . . ."  (Pl.'s Reply at 22; *accord* Pl.'s Resp. at 7–8.)  Mr. Vora testified:

> Q.    Do you have some idea of when the drawings stopped coming in?
> A.    *I think some time in the [nineties]* that we [sic]—from the best of my recollection is when we were getting the drawings up to—some time in [the nineties].  Beyond that, we were not—my recollection and the records don't have.  [sic]  So there are no drawings beyond [the nineties], sometime in the [nineties].
> Q.    Would you say early [nineties] or late [nineties]?
> A.    My recollection would be early [nineties].
> Q.    So for approximately a [ten]-year period, you were not receiving drawings from [Plaintiff] [sic]?
> A.    From [Defendant].
> Q.    I'm sorry, from [Defendant].  And then in April 2003 when you saw the advertisement, that's when you realized that maybe there were updated drawings that you had not been receiving?
> A.    Correct.

> Q.   During that [ten]-year time frame, did you ever call [Defendant] to ask about updated drawings?
> A.   Not to my recollection.
> Q.   Do you know if anyone else at [Plaintiff] did?
> A.   I don't think so.
> Q.   In your view do you think you had an obligation to do so?
>       MR. ANDRE:          Objection to the extent it calls for a legal conclusion.
> A.   No.  Onus is on [Defendant].

(Pl.'s Br., Ex. 16 at 119–21 [Dep. of H. Vora] [emphasis added].)[12]  Mr. Vora further stated that updates came in at least every six months during the period when Plaintiff was receiving them. (*Id.*, Ex. 16 at 121–22 [Dep. of H. Vora].)

Mr. Vora is correct that it would be unreasonable to expect Plaintiff to request MOI updates "on a daily basis."  (*Id.*, Ex. 16 at 121 [Dep. of H. Vora].)  Nevertheless, if the parties truly intended Defendant to send Plaintiff "each and every" MOI update, one would expect Plaintiff to have taken action at some point *before* ten years had passed without having received *any* updates from Defendant—especially given that Plaintiff had been receiving updates at least twice a year prior to Defendant's lapse.  Plaintiff's hard-line argument that it is entitled to "each and every" MOI product update does not square with: (1) Plaintiff's admitted silence as ten years

---

[12]Neither party cites to this testimony in its briefs.  This court happened upon this testimony in its review Plaintiff's citation to immediately preceding lines of deposition testimony. (*See* Pl.'s Reply at 25 [citing Pl.'s Br., Ex. 16 at 118–119 (Dep. of H. Vora)].)  While I decline to speculate why the parties failed to engage testimony so obviously material to the issues addressed in their briefs, I admonish both parties for this egregious failure and for the strong indication of disingenuity that it raises regarding the arguments the parties make in their respective motions. Because Defendant failed to raise this issue, I do not consider how Plaintiff's knowing failure to stand on its rights for a period of ten years might affect the viability of the claim it now asserts. *See generally U.S. v. Wiseman*, 297 F.3d 975, 980 (10th Cir. 2002) (recognizing "in an adversarial system such as ours, it will generally be better to consider only those defenses that are properly raised by the parties").

passed without receipt of even one MOI update, (*Id.*, Ex. 16 at 121–22 [Dep. of H. Vora]); (2)

the undisputed fact that Defendant has recorded more than 4,000 changes to the products listed in

the MOI since the agreement's execution in 1979, (Def.'s Br., Statement of Undisputed Material

Facts ¶ 15; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 15); or (3)

the existence of the 1991 letter wherein Plaintiff requested to purchase drawings of two of the

nineteen FRL product lines listed in the MOI.[13]  (*Id.*, Ex. A–9 at 1 [1991 Letter].)  Thus,

Plaintiff's pre-litigation conduct fails to support its present interpretation of MOI clause two.

Defendant contends that the MOI required it to provide Plaintiff "with updated drawings

of products only to the extent [Defendant] desired to make such products available to [Plaintiff]

for manufacture and sale."  (*Id.* at 6.)  The testimony of Defendant's Rule 30(b)(6) witness

undermines Defendant's contention:

---

[13]Plaintiff takes liberty with the record to contend that Mr. Vora's affidavit testimony
supports two conclusions regarding the 1991 letter.  First, Plaintiff contends the 1991 letter was
sent in error.  (Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 18.)  The testimony
cited in connection with this contention is merely Mr. Vora's interpretation of the letter: "In
regard to the letter dated March 4, 1991 . . . it appears that there was a deadline to be made,
perhaps errors were made due to time constraints."  (*Id.*, Ex. A ¶ 4 [12/13/05 Decl. of H. Vora].)
This evidence is not based on personal knowledge.  *See* Fed. R. Civ. P. 56(e) (2006) ("Supporting
and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would
be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to
the matters stated therein.").  Second, Plaintiff contends it did not make a $50,000 payment to
Defendant in connection with the 1991 letter.  (Pl.'s Reply, Resp. to Statement of Additional
Material Facts ¶ 7.)  The sole piece evidence cited in support of this contention does not speak to
its substance: "Although [Plaintiff] retains records for a period of seven to ten years, [Plaintiff]
has just recently located some financial records dating back to 1985."  (Pl.'s Reply, Ex. A ¶ 2
[1/12/06 Decl. of H. Vora].)  I reject both of Plaintiff's contentions and admonish Plaintiff's
sloppiness and mendacity.

Q.     And pursuant to [Defendant's] obligation in Clause [two] of the MOI, would [Defendant] have notified [Plaintiff] of any change made to documents listed in the MOI?

A.     No.

Q.     What type of changes would [Defendant] have informed [Plaintiff] of?

A.     Significant changes.

Q.     Can you describe what a significant change would mean?

A.     We make a change to casting, change the shape for whatever reason, we decide that we have got a defect in it, it needs to be changed.  It would be something that *significantly varied the manufacture of the product or the performance of the product.*

(Pl.'s Br., Ex. 4 at 35 [Dep. of D. McMahan] [emphasis added].)  Under Defendant's own interpretation of the MOI, Defendant's discretion to withhold MOI product updates is not absolute.[14]  Instead, by Defendant's own admission, its discretion is limited to the determination whether a change to any MOI product "significantly varies" the manufacture or performance of the product.  Thus, neither Defendant's nor Plaintiff's interpretation of MOI clause two is supported by the evidence.

Considering both the testimony of Mr. Vora and Defendant's Rule 30(b)(6) witness in conjunction with other extrinsic evidence, this court finds a genuine issue of material fact regarding the parties' mutual intent under the MOI.  Indeed, the extrinsic evidence itself is

_____

[14]Defendant contends that clause four of the ATS offers meaningful extrinsic evidence of the parties' past dealings.  (Def.'s Reply at 4.)  I agree that the ATS is potentially relevant evidence of the parties' mutual intent concerning the elusive phrasing of MOI clause two.  *See Strategis Asset Valuation & Mgmt., Inc. v. Pac. Mut. Life Ins. Co.*, 805 F. Supp. 1544, 1552 (D. Colo. 1992) (considering, *inter alia*, language of a former contract as evidence relevant to determination whether subsequent contract was ambiguous).  Nevertheless, ATS clause four spoke to Defendant's discretion concerning the release of new products for manufacture and sale and was silent concerning those products Defendant had already released for manufacture and sale.  (Def.'s Br., Ex. A–4 ¶ 5 [ATS].)  Defendant's argument is unpersuasive.  Even if the ATS did support Defendant's position, my ensuing analysis demonstrates that such evidence would be insufficient to resolve the genuine issue of material fact as to the parties' intent under the MOI.

arguably *more* ambiguous than the MOI's terse, outwardly referential wording.  In light of

Defendant's own "significant variation" interpretation of the MOI, two additional pieces of

evidence indicate Defendant has been in breach of its obligation to provide Plaintiff with

"significant" MOI changes for a number of years: (1) Plaintiff's statement that it received at least

two MOI updates each year up until the early nineties; and (2) Defendant's alleged failure to send

any updates for ten years.  (*See id.*, Ex. 16 at 119–121 [Dep. of H. Vora].)  One would not expect

a party that is in breach of a contract to attempt to enforce the contract against its counterparty.

Nevertheless, that is precisely what Defendant has done.  (*See id.*, Ex. 6 ¶¶ 5–6 [6/14/03 Letter

from Sen-Oberoi to Plaintiff].)  Further, Plaintiff's conduct prior to this dispute only heightens the

intractability of the facts.  Plaintiff's managing director testified that Plaintiff waited for more than

ten years before complaining of Defendant's failure to send MOI updates.  (*Id.*, Ex. 16 at 121

[Dep. of H. Vora].)  Yet Plaintiff asserts, and evidence as recent as 2004 supports, that both

parties view the MOI as a current, valid, and binding contract.  (*Id.*, Ex. 3 ¶ 4 [1/29/04 Letter

from P. Wallace to H. Vora], Ex. 8 ¶ 4 [9/14/04 Letter from D. Brant to H. Vora].)  Thus, the

extrinsic evidence serves to compound rather than resolve the MOI's ambiguity.  Once a court

determines a contract is ambiguous, its meaning is an issue of fact.  *Union Rural Elec. Assoc.*,

661 P.2d at 251.  The confounding, contradictory nature of the extrinsic evidence raised by the

parties creates a genuine issue of material fact concerning the parties' mutual intent under the

MOI.  Consequently, summary judgment on Plaintiff's contract claim is inappropriate for either

party.  As the element of breach is in issue, I do not reach the question of Plaintiff's damages.

### b.      Tort Claims

Plaintiff asserts it is entitled to summary judgment on its claims for intentional and
negligent misrepresentation.  (Pl.'s Br. at 19–26.)  Specifically, Plaintiff argues it continued to
manufacture MOI products based on outdated MOI drawings in reliance upon the italicized
portion of the following statement, made by Defendant's CEO: "I will need to determine if there
have been any changes made to the [MOI] products, - - [sic] *but my feeling is that you already
have the latest information*."  (*Id.*, Ex. 3 ¶ 4 [1/29/04 Letter from P. Wallace to H. Vora]
[emphasis added]; *see id.* at 19–20, 23–25.)  Defendant does not argue it is entitled to summary
judgment on the tort claims in either of its briefs in support of its motion for summary judgment.
(*See* Def.'s Br., *passim*; Def.'s Reply, *passim*.)  Defendant does argue that Plaintiff is not entitled
to summary judgment on the claims because: (1) the alleged misrepresentation was not of a
material fact; and (2) Plaintiff did not rely on the alleged misrepresentation.  (Def.'s Resp. at
16–19.)

The elements of Plaintiff's tort claims overlap in pertinent part.  To sustain a claim for
intentional misrepresentation, Plaintiff must demonstrate: (1) Defendant made a fraudulent
misrepresentation of material fact; (2) Plaintiff relied on the misrepresentation; (3) Plaintiff had a
right to rely on, or was justified in relying on, the misrepresentation; and (4) the reliance resulted
in damages.  *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo. 1994).  To establish a
claim for negligent misrepresentation, Plaintiff must demonstrate: (1) Defendant supplied false
information to Plaintiff in the course of a business transaction; (2) Defendant failed to exercise
reasonable care or competence in obtaining or communicating the false information; and (3)

Plaintiff justifiably relied on the false information.  *Guardian Title Agency, L.L.C. v. Matrix Capital Bank*, 141 F. Supp. 2d 1277, 1283 (D. Colo. 2001) (quoting *Mehaffy, Rider, Windholz & Wilson v. Central Bank Denver, N.A.*, 892 P.2d 230, 236 [Colo. 1995]).  The element of justifiable reliance is common to both intentional and negligent misrepresentation.  Because Plaintiff fails as a matter of law to show that it relied—justifiably or otherwise—on allegedly false information supplied by Defendant, I need only discuss that common element.

   False representations are actionable only when relied and acted upon.  *Am. Nat. Bank v. Hammond*, 55 P. 1090, 1092 (Colo. 1898).  Plaintiff argues that given its "reliance on [Defendant] to provide it with the updated information regarding the MOI products, [Plaintiff], in alignment with its past course of conduct, relied on [Defendant's] statement in the January 29, 2004 letter, and *continued* to manufacture drawings [sic] based on older drawings provided by [Defendant]."  (Pl.'s Reply at 36–37 [emphasis added]; *accord* Pl.'s Br. at 22, 24.)  Thus, Plaintiff attempts to frame the fact that it continued to manufacture MOI products based on the drawings that it had in its possession prior to receipt of the January 2004 letter as action in reliance on the letter.  (*See* Pl.'s Reply at 36–37; Pl.'s Br. at 22, 24.)  However, Plaintiff admits: "[a]fter receipt of the January 29, 2004 letter, [Plaintiff] did not receive any new [updates or] technical support from [Defendant]. . . ."  (Pl.'s Br., Statement of Undisputed Facts ¶ 28.)  By Plaintiff's own admission, then, Plaintiff continued to use the MOI drawings in its possession not because Defendant *represented* that Plaintiff had the most current drawings, but instead because Defendant *did not send* Plaintiff any new drawings.  Thus, Plaintiff was trapped by Defendant's inaction, not misled by Defendant's words.  Indeed, irrespective of Defendant's alleged

misrepresentation, Plaintiff would have found itself in exactly the same situation of which it now complains.  Accordingly, Plaintiff's assertion that it relied on the January 2004 letter is preposterous.

Even assuming Plaintiff's continued production of MOI products somehow constitutes reliance on the January 2004 letter, Plaintiff would be unable to demonstrate that it *justifiably* relied on Defendant's alleged misrepresentation.  "Justifiable reliance contemplates the reasonable exercise of knowledge and intelligence in assessing the represented facts." *Am. Safety Equip. Corp. v. Winkler*, 640 P.2d 216, 223 (Colo. 1982); *accord id.* (Lohr, J., dissenting) (approving of the above-cited majority statement and construing it to mean "it is not justifiable for a person to rely on a representation which he knows to be untrue or . . . could not reasonably believe to be true"); Restatement (Second) of Torts § 541 (1977) ("The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false.").  The evidence overwhelmingly demonstrates that Plaintiff did not believe Defendant's alleged misrepresentation.  Plaintiff sent Defendant a letter dated April 4, 2004, in which Plaintiff expressly disclaimed the very statement upon which it now claims to have relied: "Please refer to your letter of 29th January [20]04.  *We would like to reiterate that we do not have the latest drawings with respect to [the MOI] products.*  Hence, you are again requested to send the latest prints of these products alongwith [sic] their components and manufacturing drawings." (Pl.'s Br., Ex. 11 ¶ 1 [4/12/04 Letter from H. Vora to P. Wallace] [emphasis added].)  Plaintiff's

argument that it justifiably relied on a misrepresentation that it did not believe is ridiculous.[15]

Thus, I deny Plaintiff's motion for summary judgment with respect to its claims for intentional and

negligent misrepresentation.

I have noted that while Defendant does not characterize its motion as one for partial

summary judgment, Defendant fails to mention Plaintiff's misrepresentation claims in either of its

briefs in support of its motion summary judgment.  (*See* Def.'s Br., *passim*; Def.'s Reply, *passim*.)

Regardless, this court is inclined to grant summary judgment on Plaintiff's tort claims.  The

practice of granting summary judgment *sua sponte* is not favored.  *First Am. Kickapoo*

*Operations, L.L.C. v. Multimedia Games, Inc.*, 412 F.3d 1166, 1170 (10th Cir. 2005).  Indeed,

the entry of summary judgment *sua sponte* is warranted only when the following conditions are

met: (1) there is no dispute of material fact; and (2) the losing party has had an adequate

opportunity to address the issues involved, including adequate time to develop any facts necessary

to oppose summary judgment.  *N. Tex. Prod. Credit Ass'n v. McCurtain County Nat'l Bank*, 222

F.3d 800, 816 (10th Cir. 2000).  Both requirements are satisfied in the instant case.  First, I have

determined, based solely upon Plaintiff's own admissions and proffers, that the undisputed

evidence overwhelmingly defeats the conclusion that Plaintiff either relied on or could have been

justified in relying on Defendant's alleged misrepresentation.  Second, unlike the textbook

---

[15]A broader evidentiary context buttresses this conclusion.  Mr. Vora admitted Plaintiff had received MOI product updates at least twice a year up until the early nineties, but that it had not received any updates for approximately ten years by the time it began to request updates in 2004.  (Pl.'s Br., Ex. 16 at 119–121 [Dep. of H. Vora].)  Even standing alone, Mr. Vora's admissions would give rise to a strong inference that Plaintiff must have disbelieved Defendant's alleged misrepresentation.

situation where summary judgment is granted against a non-moving party, here, Plaintiff itself has

filed a motion for summary judgment on its tort claims, and thus, has had not one, but two

opportunities to marshal evidence and brief the issues in support its own argument that *it* was

entitled to summary judgment.  (*See* Pl.'s Br., *passim*; Pl.'s Resp., *passim*.)  Nevertheless, the

foregoing demonstrates Plaintiff failed to raise an issue of fact as to whether it justifiably relied on

Defendant's alleged misrepresentation.  Accordingly, I grant summary judgment in favor of

Defendant on Plaintiff's claims for intentional and negligent representation.

**3.**      ***Conclusion***

Based on the foregoing it is therefore ORDERED that:

1.      Defendant's motion (#48) is DENIED.

2.      Plaintiff's motion (#50) is DENIED.

3.      As per the court's actions, Plaintiff's second and third claims are DISMISSED

with prejudice.

4.      At the conclusion of the case after all claims are resolved, the clerk shall enter a

final judgment in favor of Defendant and against Plaintiff on Plaintiff's second and third claims.

Neither party is entitled to summary judgment on Plaintiff's first claim, which therefore remains

pending.

5.      The court will hold a Final Pretrial Conference commencing at 11:00 o'clock a.m.

on Friday, August 18, 2006, in Courtroom A1001 of the Alfred A. Arraj United States

Courthouse, 901 19th Street, Denver, Colorado.  In preparing for and participating in the

conference, the parties and counsel will (1) follow the Instructions for Preparation and

Submission of Final Pretrial Order, a copy of which can be downloaded from the court's web site,

specifically http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord_ins.pdf and (2) utilize the

specific template located at http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord.wpd  These

specific web addresses should be used to insure that the proper format is observed.

Dated this 3rd day of August, 2006

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge